# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**EVELYN BAKER MILLER,**

                 **Plaintiff,**

**-vs-**                             **Case No.  6:05-cv-579-Orl-KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

                 **Defendant.**

_____

## ORDER

      This cause came on for consideration without oral argument on the Complaint filed by Evelyn Baker Miller,[1] seeking review of the final decision of the Commissioner of Social Security denying her claim for social security benefits.  Doc. No. 1.  The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA).  Doc. No. 11.  Pursuant to the consent of the parties, this matter has been referred to me for disposition under 28 U.S.C. § 636(c).  Doc. Nos. 13, 14.

_____

     [1]      The record indicates that "Evelyn Laurene Baker" is the name listed on the Plaintiff's social security card and application for benefits, and is the name by which she requested the administrative law judge refer to her.  R. 82, 357.  However, the Complaint and memorandum filed in this case use the last name "Miller."  Doc. Nos. 1, 17.  For consistency with the pleadings filed in this case, I will use "Miller" throughout this Order.

## I.      PROCEDURAL  HISTORY.

In October 1998, Miller applied for disability benefits under the Supplemental

Security for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381, *et seq.*,

(sometimes referred to herein as the Act).  R. 82-83.  The application alleged that Miller

became disabled on September 11, 1998.[2]  *Id.*  Miller's application was denied initially

and on reconsideration. R. 62-64, 67-70.

Miller made a timely request for a hearing before an administrative law judge

(ALJ).  R. 71.  An ALJ held a hearing on July 20, 1999.  Miller, represented by a person

who was not an attorney, testified at the hearing. No other testimony was taken. R. 27-

55.

On October 21, 1999, the ALJ issued a decision that Miller was not disabled for

purposes of the Act.  R. 11-17.  Miller requested review of the ALJ's decision.  R. 7.  On

July 28, 2000, after considering additional medical evidence submitted by Miller, the

Appeals Council denied review.  R. 4-6.  On September 7, 2000, Miller timely appealed

the Appeals Council's decision to this Court.  *Miller v. Barnhart*, Case No. 6:00-cv-1181-

Orl-JGG.

On March 22, 2002, the Honorable James G. Glazebrook, United States

Magistrate Judge, issued an order remanding the case to the SSA.  R. 247-70.  Judge

Glazebrook concluded that the ALJ failed to articulate the requirements of the work that

Miller had performed in the past, and therefore, erred in concluding that Miller could

---

[2]      At the hearing held January 7, 2003, Miller's alleged onset date was amended
to July 17, 1999.  R. 352.  However, in his decision, the administrative law judge continued
to use a September 1998 date.  R. 239.

perform her past relevant work.  R. 268.  Because of inconsistencies in two residual functional capacity (RFC) assessments, Judge Glazebrook also concluded that "the ALJ should have ordered a consultative examination."  R. 269.

Following entry of Judge Glazebrook's order, the Appeals Council vacated the ALJ's decision and remanded the case for further proceedings.  R. 275.  The same ALJ held a supplemental hearing on January 7, 2003.  R. 344-97.  Miller, again represented by a person who was not an attorney, testified at the hearing.  Jennifer Matthews, a vocational expert (VE), also testified.  *Id.*

On March 25, 2003, the ALJ issued a decision finding that Miller was not disabled for purposes of the Act.  R. 238-46.  He concluded that Miller had not engaged in substantial gainful activity since her alleged onset date, despite some part-time work.  R. 239-40.  He found that the medical evidence showed that Miller had undergone a right mastectomy to excise breast cancer.  R. 240.  He found that Miller had osteoarthritis of the right knee, obesity, degenerative joint disease of the ankles, and plantar fasciitis,[3] and observed that she had been prescribed the use of a cane.  R. 240, 245.  He also found that Miller had a history of gout[4] and evidence of diverticular disease[5] and transient

---

[3]     Plantar fasciitis refers to an inflammation or swelling of fibrous tissue on the sole of the foot. STEDMAN'S MEDICAL DICTIONARY 628, 638, 1375. (26th ed., 1995) (hereinafter "STEDMAN'S").

[4]     Gout is "[a] disorder of purine metabolism . . . characterized by a raised but variable blood uric acid level and severe recurrent acute arthritis of sudden onset resulting from deposition of crystals of sodium urate in connective tissues and articular cartilage . . . ." STEDMAN'S at 764.

[5]     Diverticular disease, or diverticulitis, refers to an "inflammation of an abnormal pouch (diverticulum) in the intestinal wall, usually found in the large intestine (colon)."

left colonic spasm.  R. 245.  The ALJ concluded that these were severe impairments but that they did not meet or medically equal the impairments listed in the SSA regulations, either singly or in combination.[6]  *Id.*

The ALJ concluded that Miller's "subjective complaints of debilitating right knee pain, gout, ankle and foot pain and functional limitations were less than fully credible . . . ." *Id.*  He observed that her "testimony with respect to . . . her assertions of disabling impairments [is] not supported by the objective medical evidence to the extent alleged." R. 243. Specifically, he observed that Miller testified she may have cancer in her left breast, but that there was no medical evidence to support this belief.[7]  The ALJ observed "[a]s to her allegations of debilitating knee pain, the record documents that she does have some arthritic changes, but no instability." *Id.* The ALJ further observed that because her weight was an aggravating factor, Miller had been advised to lose weight. *Id.*

The ALJ discussed Miller's need to use a cane.  At the hearing, the VE testified that if a claimant with Miller's impairments had to use a cane with lifting, "that would pose a problem."  R. 244.  Then, the ALJ concluded, considering the assessment by Dr.

---

MEDLINEPLUS, Medical Encyclopedia, *Diverticulitis*, http://www.nlm.nih.gov/medlineplus/ency/article/000257.htm (last visited August 31, 2006).

[6]     The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

[7]     There was some discussion of a suspicious mammogram at the initial hearing, R. 48-49, but in the supplemental hearing Miller testified that she was unaware of any recurrence, R. 359.

James Ryan "as well as the other objective medical evidence," that Miller retained the RFC to perform a wide range of sedentary work activities."[8]  *Id.*

Because Miller's past relevant work as a nursery worker required more than a sedentary level of exertion, the ALJ concluded that Miller could not return to her past relevant work.  Based on the RFC determination and considering the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Pt. 404, Subpt P, App. 2, the ALJ concluded that Miller could work in other types of jobs that were available in the national economy.  The ALJ stated that "[t]he VE offered jobs in addition to those taken administrative notice by" the Grids. R. 244.  Therefore, the ALJ concluded that Miller was not disabled for purposes of the Act.  *Id.*

Miller requested review of the ALJ's decision. R. 233.  On February 19, 2005, after considering additional medical evidence submitted by Miller, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 211-14. Miller timely sought review by this Court.  Doc. No. 1.

## II.    JURISDICTION.

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Miller's request for review.  *See Falge v. Apfel*, 150 F.3d 1320,

---

[8]    "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

1322 (11th Cir. 1998); 20 C.F.R. § 416.1481.  Therefore, the Court has jurisdiction

pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

**III.     STATEMENT OF FACTS.**

  *A.     Evidence from Miller.*

Miller was born February 15, 1955.  R. 82.  She had a ninth grade education and

had not completed the GED or taken any other formal education.  R. 38, 93.  She could

read, write, and handle money.  R. 38.  She had a son, R. 36, and cared for the child of

one of his friends (but who was not her grandchild), R. 361. She received food stamps to

care for this child.  R. 361.

Miller is 5'6" tall.  R. 34.  Her weight ranged from 257 pounds, R. 34, to an

apparent high of 292 pounds, R. 352; *see also* R. 220.  In 1998, she had a mastectomy

of the right breast.  The surgery also removed the lymph nodes in her arm.  R. 35, 359.

She underwent chemotherapy and received Tamoxifen therapy.[9]  She continued to

experience pain at the surgery site, and had some pain in the left breast.  R. 46-49.

At the same time she had the mastectomy, Miller had a non-cancerous cyst

removed from her foot. R. 49, 380.  Miller also indicated that she had gout attacks in her

feet approximately every other night.  R. 49.  However, the pain was alleviated by

shaking her feet, and she had never taken medication for gout.  R. 50.

───────────────────

  [9]      Tamoxifen is a medication prescribed to regulate the effects of estrogen and
is used to treat and reduce the risk of breast cancer.  *See* MEDLINEPLUS, Drugs and
Supplements, *Tamoxifen* http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202545.html
(last visited August 31, 2006).

Miller estimated that she could sit for twenty to thirty minutes, stand for ten to twenty minutes, and walk about two city blocks before her knees would begin hurting.  R. 52-53.  Climbing stairs caused pain in her right knee.  R. 53.  She was prescribed a cane in 1999.  R. 45, 189-90, 351.  At the time of the supplemental hearing, knee surgery had been recommended.  R. 356.  She estimated her daily pain as eight on a ten-point scale. R. 378.

Miller could bathe and clean herself, but she had trouble combing her hair because her right (dominant) hand would become numb.  R. 35.  She believed that some of the numbness was incident to her mastectomy. R. 35, 359.  She required assistance with household chores.  R. 52, 377.  She had a driver's license and could drive, but did so infrequently because driving caused pain in her right leg.  R. 39, 363.  Miller's mother drove her to work.  R. 363.

Miller had worked as a nursery worker, as a liquor store cashier, as a short order cook, and as a kitchen helper at a center for the handicapped.  R. 39-42, 93, 296, 364-68, 380-81.  In a typical day in these positions she stood for up to eight hours.  R. 94.

After the ALJ's initial decision, Miller worked at a nursery potting miniature Christmas trees. R. 380-83.  She worked from four to seven hours a day at the nursery and was required to stand.  R. 366, 381-83.  At the time of the supplemental hearing, Miller worked at the center for the handicapped two days a week, for approximately four hours per day.  R. 365.  However, shortly after the supplemental hearing she was taken off the schedule because of excessive absences.  R. 295.

B.      *Medical Records.*[10]

In June 1998, Miller went to the Community Health Center with a nodule in the right breast, and an ultrasound was recommended.   R. 118.   On September 23, 1998, Miller learned that the biopsy revealed breast cancer.  Surgery was scheduled at Orlando Regional Medical Center.  R. 114.

Miller was seen by Carlos Chang, M.D., a family practitioner, for pain in her legs and for other ailments.  R. 302-23, 340-41.   Miller complained of gout, and on one occasion, of chest pain.  R. 311. In September 1998, Miller complained of gout attacks in the right ankle, accompanied with pain and swelling.  Dr. Chang's assessment was right ankle pain, rule out gout.  R. 116.  The same month, Miller was also seen at Orlando Regional Medical Center.  R. 123. She had a positive history of gout.  R. 123, 125.  She also had a two centimeter mass on the underside of her left foot.  R. 123.

On October 9, 1998, Miller underwent the mastectomy.  R. 128, 138-39.  At the same time, she also underwent an excisional biopsy of the left foot to rule out granuloma.[11]  R. 134-35.  The diagnosis of the foot mass was benign fibromatosis.[12]

---

[10]      This summary is adopted from Judge Glazebrook's order with respect to evidence before the Court at that time.

[11]      "Term applied to nodular inflammatory lesions, usually small or granular, firm, persistent and containing compactly grouped modified" cell clusters. STEDMAN'S at 768.

[12]      "A condition characterized by the occurrence of multiple fibormas," which are "benign neoplasm[s] [abnormal tissue growths] derived from fibrous connective tissue."  *Id.* at 648-49, 1182.

On October 19, 1998, Miller went to Orlando Regional Healthcare System to follow up on her foot lesion.  No serious complications were observed.  R. 106.

On October 23, 1998, Miller underwent CT scans of the head, abdomen and pelvis.  The CT scan of her abdomen revealed a large post-operative hematoma[13] in the right anterior lateral chest wall which appeared to have experienced liquidation.  The remainder of the results were unremarkable.  R. 107-08.

In October 1998, Miller was admitted to Orlando Regional Healthcare System with an admitting diagnosis of cellulitis[14] with possible abscess formation.  She had complaints of swelling, erythema[15] and warmth.  She also had a positive history of serosanguinous[16] discharge for one week.  However, she was afebrile and stable throughout her admission.  R. 171-72.

Miller was examined by Maureen Holasek, M.D., on November 6, 1998.  She complained of persistent drainage along the chest wall area.  Dr. Holasek opined that no post-operative radiation therapy was needed at that time.  Dr. Holasek advised that Miller be followed for local recurrence or new malignancy developing in the opposite breast.  R. 144-46.

---

[13]    A localized mass of extravasated blood that is relatively or completely confined within an organ or tissue, a space, or a potential space.  *Id.* at 796.

[14]    Inflammation of subcutaneous, loose connective tissue.  *Id.* at 317.

[15]    Redness due to capillary dilation.  *Id.* at 615.

[16]    Containing serum and blood.  *Id.* at 1624.

Omar R. Kayaleh, M.D., examined Miller on November 13, 1998, for evaluation of possible post-operative chemotherapy versus Tamoxifen therapy.  Dr. Kayaleh observed that she had improved since the initial evaluation by Dr. Holasek. Other than a seroma[17] which had initially drained significantly but which was improving, Dr. Kayaleh observed no post-operative concerns.  R. 142-43.

Miller elected to undergo chemotherapy.  R. 141-43.  On November 24, 1998, Miller underwent a placement of left Port-A-Cath[18] vascular infusion device for chemotherapy.  R. 165-67.

A left breast ultrasound on April 16, 1999, did not reveal any mammographic evidence of malignancy.  R. 207-08.  On review of the mammogram, Dr. Holasek observed a well-healed scar which was somewhat thick and raised, similar to keloid.[19]  No abnormality was palpated.  R. 179-80.

At some point in 1999, Miller was observed to have occult blood in her stool. R. 183.  A single contrast barium enema on April 22, 1999, revealed diverticular disease and transient left colonic spasm.  R. 176.

_____

[17]    A mass caused by the localized accumulation of serum within a tissue or organ.  *Id*. at 1623.

[18]    A long-term central venous catheter with subcutaneous ports.  *Id*. at 1428.

[19]    A nodular, firm, movable, nonencapsulated, often linear mass of hyperplastic scar tissue, tender and frequently painful, consisting of wide irregularly distributed bands of collagen.  *Id*. at 942.

-10-

In early May 1999, Miller completed chemotherapy.  R. 179-82. Dr. Holasek observed that chemotherapy had been successful, and that Miller had experienced only minor nausea.  R. 179.

In July 1999, Miller returned to Orlando Regional Healthcare System with complaints of left breast discharge for the past three months.  R. 201.   A bilateral film mammogram and sonogram revealed dense mammographic pattern without specific mammographic evidence of malignancy.  Surgical consultation and biopsy were recommended.  R. 195-96.

On July 16, 1999, Miller was seen by Dr. Chang for complaints of right knee pain that increased with movement and decreased with rest.  No knee instability was noted, although the knee was positive for crepitation.[20]  R. 182.  She returned on July 17, 1999, with continued pain.  Dr. Chang prescribed a cane.  R. 189-90. Knee x-rays were positive for degenerative joint disease, and in December 1999, Dr. Chang diagnosed osteoarthritis.  R. 302-04, 322.

---

[20]     Crepitation, or crepitus, refers to "[n]oise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together as in arthritis and other conditions."  *Id.* at 424.

For her knee pain, Dr. Chang prescribed, at various times, the use of

Darvocet,[21] R. 323, ibuprofen, R. 320, Tylenol 3,[22] R. 316, Voltaren,[23] R. 312,

Relafen, R. 303,[24] and Feldene,[25] R. 302.

In August 2000, Miller was seen by Frederick I. Pearl, D.P.M. (doctor of

podiatric medicine), for painful ankles, left worse than right, for three months.

Neurological findings were intact, her motor strength was intact, but x-rays showed

---

[21]    Darvocet is the brand name for a blend of acetaminophen and propoxyphene, and is prescribed for the treatment of mild to moderate pain.   MEDLINEPLUS, Drugs and Supplements, *Acetaminophen and Propoxyphene*, http://www.nlm.nih.gov/medlineplus/ druginfo/medmaster/a601008.html (last visited August 31, 2006).

[22]    Tylenol No. 3 is the brand name for a blend of acetaminophen and codeine prescribed for the treatment of mild to moderate pain.   MEDLINEPLUS, Drugs and Supplements, *Acetaminophen and Codeine*, http://www.nlm.nih.gov/medlineplus/ druginfo/medmaster/a601005.html (last visited August 31, 2006).

[23]    Voltaren is the brand name for a delayed release form of diclofenac, a nonsteroidal anti-inflammatory drug prescribed for the treatment of pain associated with osteoarthritis.  MEDLINEPLUS, Drugs and Supplements, *Diclofenac*, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a689002.html (last visited August 31, 2006).

[24]    Relafen is the brand name for nabumetone, a nonsteriodal anti-inflammatory drug prescribed for the treatment of pain associated with osteoarthritis. MEDLINEPLUS, Drugs and Supplements, *Nabumetone*, http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a692022.html (last visited August 31, 2006).

[25]    Feldene is the brand name for piroxicam, a nonsteriodal anti-inflammatory drug prescribed for the treatment of pain associated with osteoarthritis. MEDLINEPLUS, Drugs and Supplements, *Piroxicam*, http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a684045.html (last visited August 31, 2006).

decreased joint space and degenerative joint disease.   Dr. Pearl also observed a

possible history of gout.  R.  He started Miller on Medrol-Dosepak.[26]  R. 334.

In May 2001, Dr. Chang observed edema[27] in Miller's left leg.  R. 308.

In January 2002, Miller was seen at the Florida Radiology Associates for

knee pain.  The impression was medial degenerative joint disease.  R. 333.

Records from the Florida Hospital, dated August 2002, indicate that Miller

was seen for knee and ankle pain, which was exacerbated by walking, but which

did not prevent ambulation.  R. 335-38.  She was observed to have a limited range

of motion, an antalgic gait, and the impression was medial joint tenderness in the

left knee, osteoarthritis of the right knee, and deep venous thrombosis.  R. 336.

She ranked her pain as ten out of ten.  R. 337. She was taking Tamoxifen and

Tylenol 3.  R. 335.

In October 2002, Miller was seen at the Orange County Medical Clinic for

right knee pain.   Joint replacement was recommended.  Miller observed that she

was not helped by Celebrex,[28] and was taking Vioxx.[29]  R. 331.

---

[26]     Medrol-Dosepak is the brand name for methylprednisolone, a corticosteriod, prescribed to relief inflammation and other symptoms associated with arthritis and other conditions.  MEDLINEPLUS, Drugs and Supplements, *Methylprednisolone Oral*, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682795.html (last visited August 31, 2006).

[27]     "An accumulation of an excessive amount of watery fluid in cells, tissues, or serous cavities."  STEDMAN'S at 544.

[28]     Celebrex is the brand name for celecoxib, and is prescribed for the treatment of arthritis, including inflammation, swelling, stiffness, and joint pain.  MEDLINEPLUS, Drugs and Supplements, *Celecoxib*, http://www.nlm.nih.gov/medlineplus/druginfo/

In October 2002, Miller was seen by James P. Ryan IV, M.D., for a disability evaluation.  R. 324-330.  Dr. Ryan observed "medial space joint narrowing consistent with osteoarthritis of the . . . right knee," which was unchanged from a June 1999 x-ray.  R. 324.  He also observed that Miller used a cane at times and limped due to pain.  R. 324.  Because of this, Dr. Ryan opined that Miller would be unable to walk for prolonged periods, and would likely have difficulty standing for prolonged periods.  R. 325.  Accordingly, he opined that she "should perform only light duty or sedentary work . . . ." *Id.*  He concluded that Miller could occasionally lift up to fifty pounds, frequently lift up to twenty pounds, and stand or walk at least two hours in an eight-hour work day.  R. 327.  He opined that she had no limitations on her ability to sit, or to push and pull.  R. 328.  He opined that Miller had postural limitations that would result in occasional limitations on her ability to climb, balance, kneel, crouch, and stoop, and a complete limitation on her ability to crawl.  R. 328. He observed no manipulative, visual/communicative, or environmental limitations. R. 329.

In November 2002, Miller was seen by Dr. Chang for continued knee pain and was referred to an orthopedic specialist.  R. 331-32, 340-41.

_____

uspdi/203736.html (last visited August 31, 2006).

[29]     Vioxx is the brand name for refocoxib, and was prescribed as an analgesic and primarily used to treat arthritis pan.  It was voluntarily withdrawn from the market because of safety concerns. MEDLINEPLUS, Drugs and Supplements, *Rofecoxib*, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a699046.html (last visited August 31, 2006).

At some point before January 2003, Miller was seen by Norton M. Baker, M.D., and David Scott Osteen, M.D., for knee pain. R. 216-26.[30] Dr. Baker observed that Miller's knees were generally good, but would suddenly catch. R. 226. He also noted that Miller was using a walker at home. *Id.* In late January 2003, Dr. Baker advised Miller to use a walker for six weeks. R. 343. He also observed that conservative treatment was appropriate given Miller's age. R. 342.

Dr. Baker prescribed Hyalgan or Synvisc[31] injections for Miller's knee, and advised continued use of a walker. R. 225. The records indicate that Miller initially responded to the injections, but that they became less effective over time. R. 221-25. Dr. Osteen observed that Miller showed significant spurring and narrowing of the medial joint space consistent with degenerative arthritis exacerbated by morbid obesity. R. 220. Because of her weight, Dr. Osteen did not believe Miller was a candidate for knee replacement. R. 216-20.

*C.     Reviewing Professionals.*

In February 1999, David Z. Kitay, M.D., completed a Residual Physical Functional Capacity Assessment. Dr. Kitay stated that Miller could occasionally lift

---

[30]     Miller presented earlier records of her treatment by Norton M. Baker, M.D., and David Scott Osteen, M.D., to the Appeals Council. R. 216-26.

[31]     Hyalgan is the brand name for hyaluronate sodium, a medicine which is "injected directly into the knee to relieve pain caused by osteoarthritis." MEDLINEPLUS, Drugs and Supplements, *Hyaluronate Sodium (Systemic)*, http://www.nlm.nih.gov/medlineplus/ druginfo/uspdi/203531.html (last visited August 31, 2006). Synvisc is the brand name of a derivative of hyaluronate sodium. MEDLINEPLUS, Drugs and Supplements, *Hyaluronate Sodium Derivative (Systemic)*, http://www.nlm.nih.gov/medlineplus/druginfo/ uspdi/203582.html (last visited August 31, 2006).

fifty pounds and frequently lift twenty-five pounds.  She could stand and/or walk for six hours and sit for six hours in an eight hour work day.  Dr. Kitay observed no other limitations.  R. 149-56.

A second assessment was completed in November 1998.[32]  The reviewer limited Miller to lifting twenty pounds occasionally and ten pounds frequently. Otherwise there were no limitations observed.  R. 157-64.

D.      *Vocational Expert Testimony.*

Jennifer Matthews, a VE, testified at the supplemental hearing that Miller's work at the center for the handicapped would qualify as a kitchen helper in the *Dictionary of Occupational Titles*, and would be semi-skilled, light work.  R. 385-86. Matthews opined that some of Miller's past nursery work would qualify as a horticultural worker II, which is unskilled, heavy work, or plant care worker, which is unskilled, medium work.  R. 390.

The ALJ then asked Matthews to accept the limitations imposed by Dr. Ryan. R. 329.  These limitations included the following: that Miller would be unable to walk for prolonged period, and would likely have difficulty standing for prolonged periods; that she "should perform only light duty or sedentary work"; that Miller could occasionally lift up to fifty pounds, and frequently lift up to twenty pounds; that Miller could stand or walk at least two hours in an eight-hour work day; and that Miller had postural restrictions because of knee pain.  *See* R. 324-30.

_____

[32]        The assessment appears to be signed by Gloria Hankins, M.D.

Matthews concluded that accepting those limitations, Miller could not perform any of her past relevant work.  R. 393.  However, Matthews concluded that there would be other work that Miller could perform, including food and beverage order clerk, DOT 209.567.014, charge account clerk, DOT 205.367.014, and election clerk, DOT 205.367.030, all of which are unskilled, sedentary jobs that exist in significant numbers in the national economy.  R. 394-95.

When asked whether Miller's use of a cane would impact any of her past relevant jobs, Matthews concluded that Miller's use of a cane "would be a problem in the kitchen . . . ."  R. 353.  Matthews further opined that using a cane "should [not] make a difference in a sedentary occupation." R. 353.  However, Matthews opined that if use of a cane required use of the dominant hand, that hand would be unavailable for lifting or carrying, and would adversely affect, but not rule out, sedentary work, including the jobs proposed.  R. 354, 395.  Matthews indicated that some employer accommodation would likely be necessary.  R. 354, 395.

## IV.    STANDARD OF REVIEW.

To be entitled to disability benefits under SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable

by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §

1382c(a)(3)(A).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry

that must be followed in determining whether a claimant is entitled to benefits.  In

sum, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of
> the specific impairments set forth in 20 C.F.R. Part 404,
> Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former
> occupation?
>
> (5) Is the claimant unable to perform any other work
> within the  economy?

20 C.F.R. § 416.920(a)(4).  An affirmative answer to any of the above questions

leads to either the next question, or, on steps three and five, to a finding of

disability.  A negative answer leads to a finding of "not disabled."  *See, e.g.,*

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987) (per curiam).

"The burden is primarily on the claimant to prove that he is disabled, and

therefore entitled to receive Social Security disability benefits." *Doughty v. Apfel*,

245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However,

"the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must

produce evidence that there is other work available in significant numbers in the

national economy that the claimant has the capacity to perform." *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision.  *Dyer*, 395 F.3d at 1210.  The court may not reweigh the evidence or substitute its own judgment.  *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).  Therefore, the court will reverse if the SSA incorrectly applied the law, or if

the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

## V.    ANALYSIS.

Miller asserts two grounds supporting reversal.  First, that the ALJ erred in his assessment of Miller's need to use a cane.  Second, that the ALJ failed properly to consider Miller's testimony.

### A.    *Consideration of Miller's Need to Use a Cane.*

Miller contends that the ALJ "fail[ed] to recognize that with the use of a cane, [she] would have difficulty performing the jobs the VE identified." Doc. No. 17 at 9. Therefore, Miller contends that the ALJ's decision is not based on substantial evidence.

At step five, the burden is on the Commissioner to show that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. *Doughty*, 245 F.3d at 1278 n.2.  In some situations, this burden may be satisfied by reference to the Grids, and in other situations the ALJ must consult a VE.  *See Phillips v. Barnhart*, 357 F.2d 1232, 1242 (11th Cir. 2004).

While it is not entirely clear from the decision whether the ALJ relied solely on the Grids or also on the VE at step five, the Commissioner does not contend that reliance solely on the Grids would have been appropriate.  Accordingly, the question presented is whether the VE's testimony was adequate to identify jobs

-20-

existing in the national economy that Miller could perform in light of her need to use a cane.  As discussed above, the VE testified that use of a cane would likely require an employer to make accommodations for Miller.  The VE did not render an opinion about the number of jobs available that would accommodate Miller's use of a cane.

I have not found any cases in the Eleventh Circuit that have addressed this question.  The United States Court of Appeals for the Eighth Circuit addressed a similar question in *Eback v. Chater*, 94 F.3d 410, 412 (8th Cir. 1996).  In that case, the record established that claimant Eback would need to use a nebulizer twice during the day and twice in the evening.  In discussing the nebulizer use, the VE testified that "he assumed that an employer would allow the necessary nebulizer use on the job."  *Id.* at 412.  The VE also testified that his opinion on the work available that Eback could perform "would change if an employer were not willing to make this accommodation."  *Id.*  The Eighth Circuit rejected the VE's testimony as faulty because, among other things, "[t]he vocational expert never testified that the cited jobs routinely offer employees breaks during an eight-hour period as would be necessary for Eback's condition."  *Id.*  Other courts have followed the *Eback* decision and require that a VE testify about the number of jobs available with necessary accommodations.  *See, e.g., Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Hinchert v. Barnhart*, 362 F. Supp. 2d 706, 714 (W.D. Va. 2005); *Sullivan v. Halter*, 135 F. Supp. 2d 985, 987-88 (S.D. Iowa 2001).

In this case, the VE did not testify about the number of jobs available that would accommodate Miller's use of a cane.  Accordingly, the VE's testimony does

not provide substantial evidence in support of the ALJ's conclusion at step five of the sequential analysis.

      *B.      Consideration of Miller's Testimony.*

Miller next contends that the ALJ failed properly to consider her subjective complaints under the Eleventh Circuit's "pain standard."  Specifically, she argues that the ALJ failed to articulate sufficient reasons for discrediting her subjective testimony.

In this circuit, courts apply the following test to evaluate an ALJ's treatment of pain and other subjective testimony:  "The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain."  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir.  1995) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)).  If the Commissioner discredits the claimant's subjective testimony, she "must articulate explicit and adequate reasons for doing so."  *Foote*, 67 F.3d at 1561-62.

The only reasons the ALJ cited for finding that Miller's testimony about the limitations arising from her impairments was not fully credible are the following:

> "[C]laimant testified that she might have recurrent breast cancer, but no medical evidence was submitted documenting recurrent breast cancer.  As to her allegations of debilitating knee pain, the record documents that she does have some arthritic changes,

> but no instability.  Considering her excessive weight as a
> factor aggravating her knee condition, she has been
> advised to lose weight."

R. 243.  Substantial evidence supports the ALJ's finding that there was no medical

evidence documenting recurrent breast cancer.  However, substantial evidence

does not support the ALJ's findings with respect to the functional limitations arising

from Miller's knee pain.

The medical records reflect that Miller had osteoarthritis and degenerative

joint disease in her right knee, which are underlying medical conditions and

reasonably could cause the pain about which Miller complained.   While Dr. Chang

noted in 1999 that there was no evidence of knee instability, there is ample medical

evidence that Miller was required to use a cane, and sometimes a walker, and

walked with an antalgic gait.[33]

It also appears that the ALJ may have failed adequately to account for the

impact Miller's weight had on her knee condition.  His statement that "she has been

advised to lose weight," suggests that the ALJ did not fully consider Miller's weight

because she failed to follow prescribed treatment with respect to her obesity.  "A

physician's recommendation to lose weight does not necessarily constitute a

prescribed course of treatment, nor does a claimant's failure to accomplish the

recommended change constitute a refusal to undertake such treatment."  *McCall v.*

*Bowen*, 846 F.2d 1317, 1319 (11th Cir. 1988).

---

[33]    The Appeals Council was also presented evidence that in 2003 Dr. Baker
noted that Miller's knee would occasionally "catch," which is a sign of instability.

The SSA recognizes that obesity is a factor that must be considered when addressing functional capacity. *See* Soc. Sec. R. 02-1p, 2000 WL 628049.  Among other things, obesity exacerbates the pain on weight-bearing joints with someone who has arthritis in a weight-bearing joint, and may effect an individual's ability to perform sustained work activity over time.  *Id.* at * 6.

For these reasons, substantial evidence does not support the ALJ's credibility determination.

C.      *Award of Benefits or Remand.*

Miller requests that the Court order the Commissioner to pay her disability benefits. A court may order an award of benefits "where the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997). Here, the record does not establish disability without any doubt.  Rather, remand is required to permit the Commissioner to reevaluate Miller's RFC and to determine whether there are a significant number of jobs available in the national economy that she could perform in light of her RFC, including the need to use an assistive device.

## VI.     CONCLUSION.

For the reasons set forth herein, it is **ORDERED** that the decision of the

Commissioner is **REVERSED** and the case **REMANDED** for further proceedings.  The

Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter,

to close the file.

**DONE** and **ORDERED** in Orlando, Florida on August 31, 2006.


*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties